### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MARYLAND
### (Northern Maryland)

| | | |
|---|---|---|
| **Denise Arnot** | \* | |
| **Plaintiff** | \* | |
| **v.** | \* | **Civil Action: 14-CV-1073-JKB** |
| **Charlotte Crenson** | \* | |
| **Defendant** | \* | |

\*　\*　\*　\*　\*　\*　\*　\*　\*　\*　\*　\*

### MEMORANDUM IN SUPPORT OF
### DEFENDANT CRENSON'S MOTION FOR SUMMARY JUDGMENT

Defendant, Charlotte Crenson, by undersigned counsel and pursuant to Rule 56 of the Federal Rules of Civil Procedure, respectfully submits the following memorandum of points and authorities in support of her motion for summary judgment:

### INTRODUCTION

This suit alleges that the Plaintiffs, Denise Arnot and Fancy Cats Rescue Team (FCRT) were retaliated against by Defendant, Charlotte Crenson, after they criticized the conditions and practices at the Baltimore County Animal Shelter. The alleged retaliation was that Crenson temporarily removed Fancy Cats from the County's list of approved rescue partners. Plaintiffs claim that this alleged retaliation was in violation of their rights under the First Amendment, and its state law corollary - Article 40 of the Maryland Declaration of Rights. As will be demonstrated below, Crenson's actions did not violate either of these constitutional provisions. Concurrent with the filing of her motion for summary judgment, Defendant Crenson has also filed an Answer to the Amended Complaint, putting the case at issue. Crenson contends that the case is ripe for summary disposition.

1

## <u>SUMMARY JUDGMENT STANDARD</u>

Pursuant to Fed. R. Civ. P. 56, summary judgment should be granted where the record evidence shows that there are no genuine disputes of material fact and that the moving party is entitled to judgment. The Supreme Court has described this provision as "an integral part" of the Rules which is "designed to secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 2555 (1986). *Celotex* places on the moving party the "initial responsibility of informing the district court of the basis for its motion" and then identifying those portions of the record "which it believes demonstrate the absence of a genuine issue of material fact." *Id*. at 323, 106 S.Ct. at 2553.  The burden then shifts to the non-moving party to "set forth specific facts showing that there is a genuine issue for trial." *Id.*; Fed. R. Civ. P. 56(e).

The non-movant cannot rest upon unsupported allegations, in his pleadings or elsewhere, but must show "significant probative evidence" to support those allegations.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510 (1986).  Moreover, "[a] mere scintilla of evidence is not enough to create a fact issue; there must be evidence on which a jury might rely." *Barrick v. Celotex*, 736 F.2d 946, 958-59 (4th Cir. 1984).  If the non-movant fails to do so, then this Court has "an <u>affirmative obligation</u>...to prevent 'factually unsupported claims...' from proceeding to trial." *Sharafeldin v. Md. Dept. Of Public Safety and Correctional Services*, 131 F. Supp. 2d. 730, 737 (D. Md. 2001), *quoting Felty v. Graves-Humphrey Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987) (emphasis added).

Furthermore, a "material fact" is a fact that might affect the outcome of a party's case. *Anderson,* 477 U.S. at 247–48;  *JKC Holding Co. LLC v. Wash. Sports Ventures, Inc.,* 264 F.3d 459, 465 (4th Cir.2001). Whether a fact is considered to be "material" is determined by the

substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson,* 477 U.S. at 248; *see also Hooven–Lewis v. Caldera,* 249 F.3d 259, 265 (4th Cir.2001).

Finally, a "genuine" issue concerning a "material" fact only arises when the evidence, viewed in the light most favorable to the non-moving party, is sufficient to allow a reasonable jury to return a verdict in that party's favor. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505.

Defendant Crenson respectfully submits that the following undisputed material facts compel this Court to enter judgment in her favor on all claims.

## MATERIAL FACTS NOT IN GENUINE DISPUTE

1. Defendant, Charlotte Crenson, was at all times relevant to this suit the Chief of the Baltimore County Animal Control division (BCAC), which is a unit of the County Health Department. As part of her duties she was responsible for the operations of the Baltimore County Animal Shelter (BCAS). *See,* Crenson Affidavit at ¶ 1, attached as Ex. 1, *and see,* Amended Complaint.

2. In May of 2013 Crenson was involved in facilitating the transfer of several cats and kittens to the Plaintiff, Denise Arnot, who held herself out as the authorized representative of Fancy Cats Rescue Team, Inc., a rescue group based in Reston , Virginia.  These arrangements were made entirely via e-mails between the Plaintiff and staff members of the BCAS, including Crenson. *See,* Crenson Aff. at ¶¶. 2-6.

3. In order to be granted access to these animals BCAS staff members asked that the Plaintiff complete and submit a "Rescue Adoption Release Agreement," as well as documentation proving that Fancy Cats was a bona fide 501 (c) (3) charitable

organization. All rescue organizations are required to provide BCAS this documentation.

4. On May 24, 2013 Arnot faxed these documents to BCAS staff member Anne Thiessen. Anne Thiessen coordinated with Arnot to have a volunteer named Ron Lambert transport the animals that day from the BCAS to a location in Columbia, Maryland, where they were then transferred to other volunteers who transported them to a final destination in Virginia. Neither Arnot nor any other Fancy Cats representative ever came to the Shelter prior to obtaining these animals. *Id.*at ¶ 7. *See,* Fancy Cats documents, attached as Exhibit 2.

5. Crenson did not see the Fancy Cats Rescue Agreement or IRS documents before the animals were released to Fancy Cats. When she later reviewed the documents she saw that the address and contact information was not provided, and that Arnot was not listed on the tax documents.  *See*, Crenson Aff. at ¶ 6.

6. On May 28, 2013 Arnot e-mailed Thiessen and Leavitt informing them that some of the kittens had died, and criticizing the conditions and procedures at the Shelter. Arnot stated in relevant part that "we want to partner with BCAC but you have to provide some guarantees that the shelter is going to address the issues that are causing cats to get so sick and die! What are you doing to combat conditions at the shelter that are aggravating the situation and making it worse? It has to be a team effort. **We cannot carry the burden alone.**" Ms. Leavitt sent a reply e-mail expressing condolences and suggesting to Arnot that there were healthy cats and kittens at BCAS that were also available for adoption. *See*, Crenson Aff. at ¶ 8 (emphasis in original).

4

7. On June 2, 2013 Arnot sent Crenson an e-mail with a lengthy letter attached, again criticizing the conditions of the Shelter, and the Shelter's protocols. She closed by stating that "we want to partner with BCAC but you have to provide some guarantees that the shelter is going to address the issues that are causing cats to get so sick and die! What are you doing to combat conditions at the shelter that are aggravating the situation and making it worse? It has to be a team effort. **We cannot carry the burden alone.**" *Id.* at ¶. 9 (emphasis in original).

8. Crenson responded several hours later, as follows:

> We are sorry that you had this unfortunate experience woth [sic] our shelter, however, is [sic] is mu [sic] understanding that you were aware that they were sick when you took them. We have many healthy litters available. I am reluctant to transfer sick animals. I am removing your organization fom [sic] our rescue partner list. I am more comfortable working with partners who are able to select their rescue candidates in person. I am sorry about your experience and regret that we must discontinue working with you. Best of luck!

*Id.* at ¶. 10.

9. Later that afternoon Arnot responded via e-mail, claiming, "I am shocked by your reaction." And in response to Crenson's statement that she was more comfortable working with partners that would come select the cats they wanted to rescue, Arnot responded that "frankly we do not like to come in and 'shop' for which cat to save because we want to see them all saved." Crenson then responded as follows:

> Thank you for your email. We are very concerned about our animals, however, we work with over seventy rescues in all, so our veterinarians will continue to take care of them and our staff will continue to place them with other rescues. Thank you for your advice and we will certainly share this with our veterinarians and animal care staff.

*See,* Crenson Aff. at ¶. 11.

5

3.      On June 10, 2013 Crenson received a letter from Ron Lambert, the volunteer that had transported the cats from the Shelter to Columbia in order to help facilitate the rescue for Arnot. In his letter he asked, among other things, that Crenson reconsider the decision to part ways with Fancy Cats.  Crenson appreciated the points raised in the letter and shared it with Linda Flavin, the Shelter supervisor. They agreed that they should reconsider the decision to remove Fancy Cats from the approved rescue group list.  However, in looking at the Rescue Agreement on file for Fancy Cats, Crenson saw that there was an incomplete address and no phone number. Crenson also wanted to make sure that Fancy Cats had in fact authorized the Plaintiff to work with the Baltimore County Shelter. Accordingly, when Crenson responded to Ron she agreed to consider reinstating Fancy Cats but asked him to have them fully complete another Rescue Agreement and have it signed by one of the persons identified on their 501 (c) (3) documentation – because Ms. Arnot had signed the first Agreement and she was not listed on the tax documents. *See,* Crenson Aff. at ¶. 13.

4.      Crenson  then heard nothing further until on June 24, 2013 she received an e-mail from Ron Lambert stating as follows:

"Charlotte,  I  just wanted to tell you the status of my discussions with Fancycats Rescue. I told them that in order to be a partner with the Baltimore County Animal Shelter, they must resubmit the Rescue Agreement with the proper signature. But it does not appear they are willing to do so. Apparently I misjudged them.  I apologize for questioning your decision to end the relationship with them. If they are not willing to submit the proper paperwork, you certainly cannot be partners with them. You have done all that you can do.  Ron Lambert." *See,*Crenson Aff. at ¶. 13.

6

5.      At this point Crenson believed that either the Plaintiff had never been authorized to act on behalf of Fancy Cats, or that Fancy Cats had decided not to continue partnering with Baltimore County, and Crenson considered the matter closed. Crenson believed that Ms. Arnot was at least one of the people that Ron Lambert had spoken to at Fancy Cats, and that Arnot was therefore aware of the offer to accept them back as a rescue partner if they merely submitted the complete application with proper corporate signature. *See,* Crenson Aff. at ¶. 14.

6.      The next time Crenson heard anything about this matter was on August 5, 2013 when she received an e-mail from plaintiff's counsel, Howard Hoffman, Esquire. Attached to the e-mail was a three page letter with attachments. In this letter Mr. Hoffman accused Crenson of "blacklisting" Ms. Arnot, and threatened to sue her personally if she didn't provide written assurances to him by the close of business on August [7th] that Fancy Cats' rescue privileges had been restored. Mr. Hoffman further threatened her as follows:

> If you do not remove your restrictions, a First Amendment retaliation lawsuit will be brought against you in the United States District Court for the District of Maryland seeking damages, injunctive relief, and attorneys' fees.  My practice concentrates on successfully litigating such claims.  In May of 2012, I represented a claimant in a First Amendment retaliation lawsuit against the Sheriff of Somerset County Maryland.  The jury returned a verdict against the Sheriff for $1,112,200.00 (See attached verdict sheet).
>
> With respect to any lawsuit against you, you should not believe that you can hide behind Baltimore County and be relieved of the financial obligations of any verdict.  Baltimore County may not agree to indemnify you for your legal fees and any judgment will be entered against you (it will be a personal judgment – not against the County).  The media fallout from the lawsuits concerning your "enemies list" could go nationwide, and cost you your job.
>
> Simply put, you need to ask yourself whether your career, your finances, and your future in Baltimore is worth *preventing* cats from being rescued by Fancy Cats Rescue Team.  At this point, this matter can end very quietly, without the involvement of Baltimore County (or its Law Department), if you confirm in

7

writing that you will no longer retaliate against Fancy Cats Rescue Team, Ms. Denise Arnot, *or any other rescuers based on their speech*.  But I can assure you that if you fail to respond to this letter in an affirmative and cooperation manner, I will aggressively prosecute this case (see attached article regarding another successful First Amendment retaliation case I was involved in).

I look forward to your prompt response no later than August 7, 2013.  All that you have to do is do the right thing and allow cats to be rescued by Fancy Cats Rescue Team and Ms. Arnot.

If I fail to receive any communication from you, or I receive an unsatisfactory response from you or anyone else, your should know that I am authorized to file this lawsuit this week, and I quite comfortable representing to you that all accounts will be fully settled.  You have been warned to govern yourself in accordance with the law:  we will not allow you to retaliate against speech by impending the rescue of homeless cats.

*See,* Crenson Aff. at ¶ 16.[1]

7.      Crenson informed John Markley, the Shelter's business analyst, about the letter she had received from Mr. Hoffman and again explained to him the series of events, including the fact that she thought the matter had been resolved and that she believed that Fancy Cats had decided back in June not to pursue the partnership with BCAS. *See*, Crenson Aff. at ¶ 19.

8.      On August 9, 2013 Crenson received another e-mail from Mr. Hoffman, stating: "Ms. Crenson, You are forcing this matter to be elevated and for me to contact Baltimore County officials and notify them of our intent to sue. Once I file the notice you will be promptly sued. You were warned and you evidently have nothing to say in response, including an apology and promise that you will not do this again." Crenson had no further contact with Arnot or Hoffman. The only communications she had with either of them were via the e-mail exchanges described and documented above. *See,* Crenson Aff. at ¶¶ 20–22.

---

[1] Besides the absurdly threatening tone of Mr. Hoffman's letter, it is quite disturbing that he chose to communicate directly with Ms. Crenson knowing full well that as a County official she was represented by the Baltimore County Office of Law. "At this point, this matter can end very quietly, without the involvement of Baltimore County (or its Law Department)."

## ARGUMENT

**I.     The Plaintiff has not alleged sufficient "injury in fact" to support subject matter jurisdiction under Article III.**

As an initial matter, the case at bar should be dismissed because there is a lack of subject matter jurisdiction. In *Smith v. Frye*, 488 F.3d 263 (4th Cir. 2007) the court explained that:

> It is well settled that under Article III of the United States Constitution, a plaintiff must establish that a "case or controversy" exists "between himself and the defendant" and "cannot rest his claim to relief on the legal rights or interests of third parties." *Warth v. Seldin*, 422 U.S. 490, 498-99, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975).  Standing has three elements:
>
> First, the plaintiff must have suffered an injury in fact – an invasion of a legally protected interest which is (a) concrete and particularized; and (b) actual or imminent, not conjectural or hypothetical.  Second, there must be a causal connection between the injury and the conduct complained of – the injury has to be fairly … trace[able] to the challenged action of the defendant, and not … the result [of] the independent action of some third party not before the court.  Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (internal citations and quotations omitted).

*Id.* at 272.

The Amended Complaint[2] alleges that "Plaintiff performs volunteer rescue coordination services for Fancy Cats Rescue Team . . ." Amended Complaint, ¶ 6.  It is further alleged that after Plaintiff sent an email to Defendant, Charlotte Crenson, that was

---

[2] Defendant Crenson filed a motion to dismiss the original Complaint. In response the Plaintiff filed a First Amended Complaint and an opposition to the motion to dismiss. The Amended Complaint adds Fancy Cats Rescue Team, Inc. as a Plaintiff and attempts to bolster the factual support for their causes of action.

critical of the Baltimore County Animal Shelter, that Crenson retaliated by responding in an email to Plaintiff that she was "removing your organization fom (sic) our rescue partner list." Amended Complaint, ¶ 16.

First, it is far from clear that the privilege of "rescuing" animals from a county shelter is a cognizable liberty or property interest under the Constitution of the United States. Even if Crenson's action is deemed to be in response to Arnot's criticism, it does not automatically follow that Plaintiffs have stated a viable First Amendment claim. Indeed, "not every reaction made in response to an individual's exercise of his First Amendment right to free speech is actionable retaliation." *Suarez Corp. Industries v. McGraw*, 202 F.3d 676, 685 (4th Cir. 2000). This is so because "not every restriction is sufficient to chill the exercise of First Amendment rights, nor is every restriction actionable, even if retaliatory." *DiMeglio v. Haines*, 45 F.3d 790, 806 (4th Cir. 1995). Accordingly, the plaintiff must show that they have lost a valuable, tangible benefit. *Surarez,* 202 F.2d at 686. And the question of whether the benefit was of constitutional significance is a question of law for the court. *ACLU v. Wicomico County, Maryland,* 999 F.2d 780 (4th Cir. 1993)*; Huang v. Bd. of Governors of Univ. of North Carolina*, 902 F.2d 1134, 1140 (4th Cir. 1990); *Burgess v. Moore,* 39 F.3d 216 (8th Cir. 1994).

Cases interpreting the scope of the Due Process clause provide guidance as to what rights are of constitutional significance. In *Town of Castle Rock, Colo. v. Gonzales* 545 U.S. 748, 756 (2005), the Court explained that "the procedural component of the Due Process Clause does not protect everything that might be described as a 'benefit.' 'To have a property interest in a benefit, a person clearly must have more than an abstract need or desire' and 'more

10

than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it.' Such entitlements are,'of course, ... not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law.'" (internal citations omitted).  The Court further observed that "[o]ur cases recognize that a benefit is not a protected entitlement if government officials may grant or deny it in their discretion. *See*, *e.g., Kentucky Dept. of Corrections v. Thompson,* 490 U.S. 454, 462–463 (1989)."  In *Castle Rock* the Court held that the plaintiff had no right under the Due Process clause to compel the town's police department to enforce a domestic protective order because she had only an *expectation* that it would be enforced – not an *entitlement* to it under the applicable state law. *Id.,* 545 U.S. at 760-64.

In the case at bar Defendant Crenson had the discretion to determine whether or not the BCAS should partner with a given rescue group. Given the way that the first transaction with Fancy Cats had unfolded, and Arnot's demands for "assurances," it was within Crenson's discretion to decide not to proceed with Fancy Cats as a rescue partner.  And given this discretion (which she subsequently exercised to try to reestablish the partnership) it is clear under the Supreme Court's precedents that Fancy Cats privilege to rescue cats was not a constitutionally protected property interest. As such, the suspension of that privilege was not a cognizable constitutional injury and the Plaintiffs therefore lack standing under Article III.

Further, assuming the privilege of adopting cats is a constitutionally protected right, the only "injury" the Plaintiffs even arguably suffered was the loss of their rescue "privileges" from June 4, 2013 until, at the latest, June 24, 2013.   Indeed, on June 10, 2013 Defendant Crenson authorized Ron Lambert to reach out to Arnot and Fancy Cats for the purpose of reinstating Fancy Cats as a rescue partner with Baltimore County. But,

11

as Mr. Lambert reported to Crenson on June 24, 2013, "**I told them [Fancy Cats] that in order to be a partner with the Baltimore County Animal Shelter they must resubmit the Rescue Agreement with the proper signature. But it does not appear that they are willing to do so. Apparently I misjudged them.**" *See,* Ex. 1 F (emphasis added).

Plaintiffs aver in the Amended Complaint that "Plaintiff FCRT was injured in fact by Defendant's decision to eliminate its rescue privileges." *Id.* at ¶ 19. And further, that Crenson's actions "injured Plaintiff Arnot insofar as she suffered emotional distress as a result of Defendant's unlawful action, as Plaintiff Arnot (and other rescue persons of ordinary firmness) would have been disturbed to think that cats/kittens are being euthanized and not rescued based on her speech and the resulting withdrawal of rescue privileges for Plaintiff FCRT …". *Id.* at ¶ 20. Plaintiffs go so far as to allege that Crenson acted *maliciously* by "hitting Plaintiff Arnot 'right where it hurt,' i.e., harming Plaintiff Arnot in a very personal way as she knew that Plaintiff Arnot views these as 'life and death' matters and is only motivated to perform such actions based on a moral calling to protect the welfare of animals and cats in particular." *Id.* at ¶ 26.

However, Plaintiffs actions speak louder than their lawyer's words. If Arnot was so morally compelled to rescue more cats from BCAS all she had to do was either adopt them herself, or submit the proper paperwork so that they could be rescued by Fancy Cats.  But when Ron Lambert – a colleague of hers in the rescue community – reached out to Plaintiffs in early June and informed them that this was all they had to do, Plaintiffs weren't interested. Further, since re-establishing itself on the County's rescue partner list in January 2014 (under the same conditions offered in June 2013) Fancy Cats

has not asked to rescue a single animal from the County shelter. *See,* Crenson Aff. at ¶ 24.

In sum, the only "injury" Plaintiffs have conceivably suffered is one of their own making, for even if Crenson was wrong or intemperate in initially retracting Plaintiffs' privileges she offered almost immediately to reinstate them upon the fulfillment of the same conditions that every other rescue group had to abide by.  As such, Plaintiffs have not met the threshold Article III requirement of establishing an "injury in fact."

## II.   Crenson is entitled to summary judgment based on the undisputed material facts and the controlling law.

Defendant Crenson is well aware that Plaintiff Arnot had the absolute right to criticize her personally, and the BCAS in general. However, as she has attested in her Affidavit, her initial decision to part ways with Fancy Cats had nothing to do with Arnot's criticism. It was based on the fact that she believed that the practical difficulties in working with this out of state rescue group, via the use of transporters, would not be mutually beneficial. And further, that she could not give Arnot the "assurances" Arnot had demanded regarding the changes and improvements Arnot had outlined in her e-mails. *See,* Crenson Aff. at ¶ 10.

Further, as explained above, even if Crenson's action is deemed to be in response to Arnot's criticism, it does not follow that Plaintiffs have stated a viable First Amendment claim because, again, "not every reaction made in response to an individual's exercise of his First Amendment right to free speech is actionable

retaliation." *Suarez, supra,* 202 F.3d at 685.  The *Suarez* court set out the three prong test that a plaintiff must satisfy to state a viable retaliation claim:

> First, the plaintiff must demonstrate that his or her speech was protected.  Second, the plaintiff must demonstrate that the defendant's alleged retaliatory action adversely affected the plaintiff's constitutionally protected speech.  Third, the plaintiff must demonstrate that a causal relationship exists between its speech and the defendant's retaliatory action.

*Id.,* 202 F.3d at 686 (internal citations omitted).

Further, as Plaintiffs appear to concede in paragraph 20 of the Amended Complaint, in addition to proving these elements, they must also show that "the defendant's allegedly retaliatory conduct would likely deter 'a person of ordinary firmness' from the exercise of First Amendment rights." *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 500 (4th Cir. 2005).

As noted above, Crenson concedes that the Plaintiff's speech was protected - as it concerned a matter of some public importance – the welfare of animals at the County shelter.[3]  However, Plaintiff's claims fail on the second and third prongs.

The opinion in *Wicomico County, supra,* is instructive. In that case the County prison officials severely restricted the access privileges of the ACLU's paralegal in reaction to the ACLU filing suit against the County concerning the prison's operations. The ACLU then brought a First Amendment retaliation suit. The Fourth Circuit acknowledged that the ACLU's filing of the initial suit carried "significant constitutional

---

[3] Plaintiffs, however, shamelessly overstate the significance of their case by quoting from Dr. Martin Luther King's "Letter from Birmingham Jail" and equating their cause and status to his. *See,* Doc. No. 9, footnote 4.

protections, implicating the First Amendment right to petition the government for redress of grievances, and the right of access to the courts." *Id.* at 785. However, the court then explained that in order to state a retaliation claim, Appellees are required to show that WCDC's actions adversely impacted these First Amendment rights. Withdrawal of a special accommodation of an ACLU paralegal, whether or not done in response to filing a lawsuit, is not sufficiently adverse to her or to the ACLU to constitute retaliation." *Id.*

The *ACLU* court explained that a First Amendment retaliation claim fails where the adverse action "does not deny [plaintiffs] the right to associate, to speak, to publish, to recruit members, or otherwise express and disseminate their views." *Id.* at 786, *quoting South Carolina Educ. Ass'n v. Campbell,* 883 F.2d 1251, 1257 (4th Cir. 1990). In reversing the district court's denial of qualified immunity the *ACLU* court characterized the restriction of the paralegal's access privileges "no more than a *de minimus* inconvenience." *Id.* at 786, n.6.

The *Saurez* case is also instructive on this point as the court in that case surveyed the types and degree of injury a plaintiff must suffer in order to state a viable First Amendment retaliation claim. The court observed that in the employment setting "courts have declined to find that an employer's actions have adversely an employee's exercise of his First Amendment rights where the employer's alleged retaliatory acts were criticism, false accusations, or verbal reprimands." *Id.*, 202 F.2d at 686. Instead, the plaintiff must show that they have lost a valuable, tangible benefit. *Id.* And the question of whether the benefit was of constitutional significance is a question of law for the court.

*Wicomico County, supra; Huang, supra,* 902 F.2d at 1140; *Burgess v. Moore,* 39 F.3d 216 (8th Cir. 1994).

In the case at bar, like the paralegal in the *ACLU* case, Plaintiffs suffered at most a *de minimus* injury: being temporarily removed from the approved rescue list. As explained above, at most a couple weeks went by before Mr. Lambert conveyed the fact that they were welcome to resume their rescue activities with BACS- all they had to do was provide their contact information and proper corporate authorization.

Further, Defendant Crenson acknowledges that she may have acted hastily or intemperately in initially removing Fancy Cats from the list. *See,* Crenson Aff. at ¶ 14, 19. However, a fair reading of Ms. Arnot's e-mails reveals that she all but baited Ms. Crenson into taking this action. Rather than actually engaging in a constructive dialogue with Crenson, Ms. Arnot chose instead to pontificate and scold. "At Fancy Cats we've been in the rescue business long enough to recognize that cats arriving en masse in such poor condition is areflection [sic] of the shelter from where they've come. This is not the first catthat [sic] we've encountered from your facility that was on death's door. And so it begs the question; what measures are being taken on your end to prevent this problem? . . . We are arescue [sic] run on donations, without a full salaried staff, so we cannot fathom how ashelter [sic] with paid employees, and a budget, is not doing more to save the animals in your care . . . we need assurances that the shelter is going to address the issues that are causing cats to get sick anddie [sic]. It has to be a team effort. We cannot carry the burden alone." *See,* Amended Complaint, Exh. 1. Arnot felt comfortable making all these harsh assessments without ever having set foot in the BCAS. And when in response

Crenson explained to Arnot that she was "more comfortable working with partners who are able to select their rescue candidates in person," Arnot responded "frankly we do not like to come in and 'shop' for which cat to save because we want to see them all rescued." *Id.*

It is small wonder that Crenson got the impression that Fancy Cats did not seem to be interested in a mutually constructive partnership. And in any event Crenson was simply not in a position to give Arnot the "assurances" she was demanding as a condition of Fancy Cats continuing to partner with BCAS. Just as the prison officials in the *ACLU* case had the right to impose reasonable restrictions on access to their facility, Ms. Crenson had the right to insist that if Fancy Cats wanted to continue as a rescue partner that they come to the Shelter and select their rescue candidates, rather than have them delivered and then object to their condition after the fact. And it is respectfully submitted that the restrictions placed on the paralegal in the *ACLU* case were more arduous, and the underlying First Amendment issues more profound than those in this case.

Finally, as to the last prong of the analysis, the Fourth Circuit cautioned that "the causation requirement is rigorous; it is not enough that the protected expression played a role or was a motivating factor in the retaliation; claimant must show that 'but for' the protected expression the [government official] would not have taken the retaliatory action." *Huang, supra,* 902 F.2d at 1140. At page 17 of their Opposition to Crenson's Motion to Dismiss (Doc. No. 9), the Plaintiffs cite *Mt. Healthy School Dist. v. Doyle,* 429 U.S. 274, 287 (1977) for the proposition that they need only show that the speech in question was a "substantial" or "motivating" factor for the alleged retaliation. However,

17

the *Huang* decision cites a more recent Supreme Court case: *Givhan v. Western Line Consol. School Dist.*, 439 U.S. 410, 417 (1979), and other post-*Doyle* Fourth Circuit precedent for the "but for" standard, and therefore it is this "rigorous" standard that controls.

It is respectfully submitted that Plaintiffs' claims fail as a matter of law under this test.  Even assuming the facts in the light most favorable to the Plaintiff, no reasonable juror could not conclude that Arnot's "speech" was the *sole* reason that Crenson removed Fancy Cats from the approved list. Indeed, the reasons she stated in her email were perfectly logical in light of the circumstances. The evidence does not suggest that Crenson was reacting in *any* way to Arnot's "speech" – as scathing and condescending as it was. Rather, Crenson first apologized for Arnot's experience and then explained that, "however, it is mu [sic] understanding that you were aware they were sick when you took them. We have many healthy litters available. I am reluctant to transfer sick animals. I am removing you from our rescue partner list. I am more comfortable working with partners who are able to select their rescue candidates in person." *See,* Amended Complaint, Exh. 1.

Further, as attested to by Ms. Crenson, she and her  staff received constant criticism of this nature. It simply comes with the territory and Crenson understand that animal rights activists have strong feelings and that they are entitled to express them. As Crenson explained, there is a contentious dispute in the animal shelter/rescue arena between those that favor the "catch, neuter, and release" model, where animals are released from Shelters – often to live in feral communities that pose myriad public health issues- and those that believe that euthanasia is a better option

when a viable adoptive home cannot be found. Baltimore County follows the second model and that has engendered strong and often vitriolic protest from those in the other camp. These protests and criticisms are continuing and if anything have gotten more vitriolic in the last year. Indeed, Crenson and her managerial staff  have been the subject of on-line posts referring to them as "butchers" and "Nazis" by certain factions of the rescue group community. *See,* Crenson Aff. at para. 18. *See also,* representative Internet postings, attached as Exhibit 2. The point is that Arnot's criticism paled by comparison and no reasonable juror could conclude that it was the "but for" cause of Crenson's action.

In addition, as explained at length above, a week after Crenson removed Fancy Cats from the list she reconsidered her decision and attempted to reach back out to them through a colleague of theirs in the rescue community – hardly the act of someone bent on retaliation. Of course Plaintiffs were apparently not interested in reestablishing their partnership with BCAS.

Finally, Crenson's act in removing Fancy Cats from the approved list has most certainly not had the effect of "chilling" criticism of the BCAS. In fact the criticism of the BCAS has, if anything, grown harsher since Crenson's alleged act of retaliation in June of 2013. For example in early 2014 many persons of "ordinary firmness" in the rescue community formed an organization called "Reform Baltimore County Animal Services," and have recently staged several protests at the Baltimore County Courthouse. Ironically, Plaintiffs attached a newspaper article documenting this movement as an exhibit to their Opposition to Crenson's Motion to Dismiss (Doc. No. 9, Exh. 3).  Further,

BCAS critics routinely lambaste the BCAS management and the County's elected officials. *See,* Exh. 3. Thus, Plaintiffs' claims also falter on this element of proof.

## III.   The claims under the Maryland Declaration of Rights are also subject to dismissal.

Count II of the Complaint alleges a retaliation claim under Article 40 of the Mayland Declaration of Rights. It is settled law that Article 40 is *in pari materia* with the First Amendment and provides no broader rights of recovery. *Nefredo v. Montgomery County,* 414 Md. 585, 593 (2010); *WBAL-TV v. State*, 300 Md. 233 (1984). Count II is therefore subject to dismissal under the same grounds and authorities as Count I.

## IV. Even if this Court finds that the First Amendment was violated Ms. Crenson is entitled to qualified immunity because her actions did not violate clearly established law.

As the Court is well aware, "[q]ualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law. *Malley v. Briggs*, 475 U.S. 335, 341 (1986). It protects government officials from 'bad guesses in gray areas' and ensures that they are liable only 'for transgressing bright lines.' *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992)."

Further, because "qualified immunity is an entitlement not to stand trial or face the other burdens of litigation . . . rather than a mere defense to liability," the trial court should "resolve immunity questions at the earliest possible stage in the litigation." *Saucier v. Katz*, 533 U.S. 194, 200-01 (2001) (internal quotation and citation omitted). In deciding whether a right is clearly established the court must ask "whether it would be clear to a reasonable officer [or in this case government official] that [her] conduct was

unlawful in the situation he confronted." *Id.* at 202. And in conducting this analysis this court must use "the appropriate level of specificity" as to whether the law was clearly established given the facts in this particular case. *Wilson v. Layne,* 526 U.S. 603, 615 (1999).

In their Opposition to Crenson's Motion to Dismiss the Plaintiffs relied primarily on *McAfee v. Deale,* 20 F. Supp. 2d 943 (E.D. Va. 1998) for the proposition that Crenson violated clearly established law. Such reliance is a bit misplaced since that decision was reversed. *See, McAfee v. Deale*, 229 F.3d 1143 (4th Cir. 2000). Yet Plaintiffs urge that "[i]n reversing the denial of qualified immunity, the Fourth Circuit reasoned **not** that the right was not clearly established but rather focused on the alleged unruly and rude behavior of the activist." (Doc. No. 9 at page 21). Plaintiffs further aver that "[a] reasonable government official would know . . . that non-disruptive speech critical of shelter management was protected by the First Amendment, and that any retaliation in response to such speech would have been unlawful." *Id.* Defendant Crenson has already acknowledged the obvious right of activists to voice their criticisms. However, the question here for purposes of qualified immunity is whether, under the specific circumstances of this case, it was clearly established that removing Fancy Cats from the rescue list would constitute unlawful retaliation for that protected speech. And in this regard the *Deale* case does not help Plaintiffs. First of all, the shelter official's actions in *Deale* were much more punitive. The plaintiff in that case was informed she was banned for life from setting foot in the Shelter. The police were summoned to escort her out on one occasion, and she was threatened with criminal prosecution for trespassing. 20 F.

Supp. 2d at 947. In the instant case Ms. Crenson merely informed Arnot that she was removing Fancy Cats from the approved rescue list because of the many practical difficulties that had already become apparent, and because she could not give Arnot the "assurances" Arnot had demanded. At no time was Arnot told that she was not free to come to the Shelter and adopt animals on her own. And Fancy Cats was informed shortly after the suspension of their privileges that they were free to reestablish their partner agreement with BCAS if they would just submit the proper paperwork required of all rescue groups.

In addition, as noted above, it is hardly clear whether the privilege of rescuing animals is a constitutionally protected right. Therefore under immunity principles a lay person like Crenson should not be deemed to be on notice of it. Defendant Crenson respectfully submits that if her actions could be deemed to violate the First Amendment that she did no more than "make a bad guess in a gray area." *Maciariello v. Sumner, supra.* She is therefore entitled to qualified immunity from the claims asserted against her and should be spared the vexation and expense of further litigation, including the specter of attorney's fees.

## V.     The claim for punitive damages must be dismissed even if any of the substantive claims survive.

The facts alleged by the Plaintiff in this case, even if believed in every respect by a jury, fail to establish the sort of conduct that would justify an award of punitive damages against Ms. Crenson.  Punitive damages are available in an action brought under § 1983 only "when the defendant's conduct is show to be motivated by evil motive or intent, or

when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56, 103 S. Ct. 1625 (1983). "It is an extraordinary remedy and is designed to punish and deter particularly egregious conduct." *Stephens v. S. Atl. Canners, Inc.*, 848 F.2d 484, 489 (4th Cir. 1988).

In Maryland the threshold for an award of punitive damages is even higher and requires a showing of actual malice, which has been defined as "an evil or rancorous motive influenced by hate, the purpose being to deliberately and willfully injure the plaintiff." Barbre v. Pope, 402 Md. 157, 182 (2007), *quoting Williams v. Mayor & City Council of Baltimore*, 359 Md. 101, 131 n. 16, (2000). No reasonable juror could find that Ms. Crenson acted with the requisite degree of malice to support punitive damages under either federal or Maryland law.

## CONCLUSION

For all of the foregoing reasons, Defendant Crenson respectfully asks this Court to enter an Order granting summary judgment in her favor on all claims.

Respectfully submitted,

MICHAEL E. FIELD
County Attorney

_____/s/_____
PAUL M. MAYHEW.
Assistant County Attorney
Old Courthouse, Room 219
400 Washington Avenue
Towson, Maryland 21204
(410) 887-4420
Facsimile: (410) 2960931
pmayhew@baltimorecountymd.gov
Counsel for Defendant

**Electronically Filed: July 24, 2014**