**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**
(Northern Maryland)

| | | |
|---|---|---|
| **Denise Arnot, et al.** | * | |
| **Plaintiffs** | * | |
| v. | * | Civil Action: 14-CV-1073-JKB |
| **Charlotte Crenson** | * | |
| **Defendant** | * | |

\* \* \* \* \* \* \* \* \* \* \* \*

**DEFENDANT CRENSON'S REPLY TO PLAINTIFFS' OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

Defendant, Charlotte Crenson, by undersigned counsel, respectfully submits the following memorandum of points and authorities in Reply to Plaintiffs' Opposition to her Motion for Summary Judgment.

**ARGUMENT**

Plaintiff s filed a forty two (42) page opposition to Ms. Crenson's motion for summary judgment but they have failed to rebut the following conclusive legal arguments presented in Crenson's Motion: (1) that Plaintiffs have failed to allege sufficient injury to have standing in this federal court; (2) that the privilege of rescuing cats is not a "right" or "benefit" that is protected by the Constitution of the United States; (3) that Ms. Crenson is entitled to qualified immunity because her actions did not violate clearly established law; and, (4) that the "facts" alleged

1

in this case cannot, as a matter of law, support a finding of actual malice on Ms. Crenson's part.

As a result Ms. Crenson's motion for summary judgment should be granted so that she is not forced to endure the further vexations and costs of litigation.

**A.   Plaintiffs cannot show sufficient injury to support their right to maintain a federal lawsuit.**

Ms. Crenson pointed out in her summary judgment memorandum that "Even if Crenson's action is deemed to be in response to Arnot's criticism, it does not automatically follow that Plaintiffs have stated a viable First Amendment claim. Indeed, 'not every reaction made in response to an individual's exercise of his First Amendment right to free speech is actionable retaliation.' *Suarez Corp. Industries v. McGraw*, 202 F.3d 676, 685 (4th Cir. 2000). This is so because 'not every restriction is sufficient to chill the exercise of First Amendment rights, nor is every restriction actionable, even if retaliatory.' *DiMeglio v. Haines*, 45 F.3d 790, 806 (4th Cir. 1995). Accordingly, the plaintiff must show that they have lost a valuable, tangible benefit. *Surarez,* 202 F.2d at 686. And the question of whether the benefit was of constitutional significance is a question of law for the court. *ACLU v. Wicomico County, Maryland,* 999 F.2d 780 (4th Cir. 1993)*; Huang v. Bd. of Governors of Univ. of North Carolina*, 902 F.2d 1134, 1140 (4th Cir. 1990); *Burgess v. Moore,* 39 F.3d 216 (8th Cir. 1994). (ECF Doc. 14 at p. 10)

Plaintiffs' response is rather telling, in that they concede that the injuries they complain of are merely "identifiable trifles." (ECF Doc. 19 at p. 15) And they cite *U.S. v. Students Challenging Regulatory Agency Procedures (SCRAP), Inc.,* 412 U.S. 669, 690 n.14), for the proposition that even such "trifles" can confer Article III standing. But that relaxed interpretation of standing (under the federal Administrative Procedure Act) was a high water mark for plaintiffs. In *Lujan v. Defenders of Wildlife,* 497 U.S. 871 (1990) (*Lujan I*), the Court explained that:

> "[r]espondent places great reliance, as did the Court of Appeals, upon the decision in [*SCRAP*]. The *SCRAP* opinion, *whose expansive expression of what would suffice for Sec. 702 review has never since been emulated by this Court*, is of no relevance here, since it involved not a Rule 56 motion for summary judgment, but a Rule 12 (b) motion to dismiss on the pleadings."

*Id.*, 497 U.S. at 889 (emphasis added).

Thus Plaintiffs' reliance on the "identifiable trifle" standard is likewise misplaced.

Further, try as they might Plaintiffs identify only speculative or *de minimus* harm – the sort of injuries precluded by the Fourth Circuit precedent above. Plaintiffs rely on the following "injuries": (a) that Crenson's action "serves to chill a reasonable member of the rescue community, of ordinary firmness, from engaging in further criticism of shelter operations, because such person would believe that they too would have their privileges restricted . . ." (ECF 19 at p.15-

3

16). But Plaintiffs' own Exhibit 9 - containing two separate media reports of anti-shelter demonstrations - completely undermines this claim. Clearly there has been *no* chilling effect. This fact is also attested to in Ms. Crenson's sworn and unrebutted affidavit wherein she notes that "[t]hese protests and criticisms are continuing and if anything have gotten more vitriolic in the past year. Indeed, I and my managerial staff have been the subject of on-line posts referring to us as 'butchers' and 'Nazis.'" (ECF 14-1)

    Plaintiffs also generally aver in (b) and (c) of their itemized list of damages that they suffered harm because they "would have" had to disassociate from each other if they hadn't brought this First Amendment challenge. (ECF 19 at p. 16). But these allegations are purely speculative, not "concrete and particularized," as Article III requires. *Lujan v. Defenders of Wildlife*, 540 U.S. 555, 560 (1992) (*Lujan II*).

    Plaintiffs next allege in item (d) that Arnot suffered emotional distress "as Plainfiff Arnot *would have* been disturbed to think that cats/kittens are being euthanized and not rescued based on her speech and the resulting withdrawal of rescue privileges." (ECF 19 at p. 16). But Arnot fails to attest to this emotional distress in her Affidavit. (ECF 19-8) Further, she concedes in her Affidavit that on June 11, 2013 - a mere 9 days after the withdrawal of her "privileges" on June 2, 2013 - Ron Lambert emailed her  and "indicated to me that Ms. Crenson 'may

reconsider' her decision if we provided her with a signed rescue agreement and tax documents." *Id*. She then claims, however, that "[b]ecause we had already provided these documents, we did not understand this to be an *unconditional* offer to reinstate our rescue benefits and privileges." *Id.*

First, what constitutional right did Plaintiffs have to an "unconditional" reinstatement of their rescue privileges? Baltimore County is entitled to demand that the Rescue Agreements are signed by persons who have the legal authority to do so on behalf of the rescue organization, and this is all that was being requested. Indeed, Ron Lambert stated in his email to Ms. Crenson that he told Arnot that "they must submit the Rescue Agree [*sic*] with the *proper* signature." (ECF 14, Exh F) Not just "a signed rescue agreement" as Ms. Arnot attests. So, as noted in Crenson's motion for summary judgment, any emotional harm in thinking of these "unrescued" cats and kittens could have been cured by Ms. Arnot herself as early as June 11, 2013 if she had simply done the bare minimum to clear this issue up. Instead she told Mr. Lambert "no thanks" and went to see a lawyer.

Plaintiffs further allege in item (e) of their list of injuries that Plaintiff Arnot "would have reasonably believed that her association with some *other* rescue group would jeopardize and harm that *other* rescue group." And in item (f) that "she would have been forced to affiliate with some other non-profit group . . . if she wanted to continue to rescue cats/kittens from Baltimore County." (ECF 19 at p.

16). But this is completely nonsensical because Arnot avers in her Affidavit that *"Since being banned, we have assisted in rescuing cats from BCAS but in conjunction with other rescues."* (ECF 19-8) So apparently Plaintiffs were not *that* worried about the harm that may have -but apparently hasn't - befallen those other rescues. Nor could Arnot have logically suffered the pain of not being able to rescue these animals – since by her own sworn testimony she *was* rescuing them. Further, it is interesting to note that in the Affidavit submitted by Florence Homer, a volunteer with another rescue group, Ms. Homer attests that "We did pull 1 cat from them [BCAS] *but that was facilitated through Fancy Cats Rescue Team."* (ECF 19-6).

>Plaintiffs sum up their flawed "injury in fact" argument by claiming that:
>
>>Even assuming arguendo that Defendant Crenson "almost immediately" offered to reinstate rescue privileges and benefits to Plaintiffs (which she assuredly did not), Defendant Crenson provides no legal support for the proposition that even a temporary lapse in that right is not a constitutional injury.  Defendant's suggestion that it can even temporarily terminate the Plaintiffs' rights, even if retaliatory, without causing injury in the constitutional sense defies any logic and is unsupported by law.  As stated, a mere "trifle" – which these injuries assuredly are not – provide more than sufficient "injury in fact" to confer constitutional standing on the Plaintiffs to challenge Defendant's unconstitutional action. *See U.S. v. SCRAP, supra*.

(ECF 19 at p. 20)

But Plaintiffs are wrong. Ms. Crenson cites *Lujan,* and numerous binding Fourth Circuit precedents for this very proposition; namely, that speculative, temporary, self inflicted, and *de minimus* injuries will not support Article III standing. *See,* ECF 14 at pps. 9-10. Plaintiffs bear the burden of establishing that they have standing to seek redress in this Court. The question of standing is, of course, a question of law for the Court to decide. *Lujan, supra; Smith v. Frye, supra.* Ms. Crenson respectfully submits that Plaintiffs have failed to carry their burden and that the Court is therefore obligated to dismiss this suit for lack of jurisdiction.

B.   **The privilege of rescuing cats from the BCAS is not protected by the Constitution of the United States.**

Ms. Crenson explained in her initial memorandum that not every alleged deprivation is of constitutional significance. For example, in *Town of Castle Rock, Colo. v. Gonzales* 545 U.S. 748, 756 (2005), the Court explained that "the procedural component of the Due Process Clause does not protect everything that might be described as a 'benefit.' 'To have a property interest in a benefit, a person clearly must have more than an abstract need or desire' and 'more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it.' Such entitlements are,'of course, ... not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law.'" (internal citations

omitted). The Court further observed that "[o]ur cases recognize that a benefit is not a protected entitlement if government officials may grant or deny it in their discretion. *See*, *e.g., Kentucky Dept. of Corrections v. Thompson,* 490 U.S. 454, 462–463 (1989).

Ms. Crenson pointed out that Plaintiffs had no "claim of entitlement" to these rescue privileges, and that this was due in part to the fact that she had discretion to determine whether or not the BCAS should partner with a given rescue group. As such, this "privilege" was not a liberty or property interest under the Supreme Court's precedents. (ECF 14 at p. 11)

Plaintiffs have absolutely failed to address, let alone rebut, these arguments. Instead they merely assert that "a public official who restricts the award of or terminates public benefits based on the citizen's exercise of his First Amendment rights adversely affects that citizen's First Amendment rights." (ECF 19 at p. 23), *quoting, Suarez Corp. v. McGraw*, 202 F.3d at 686. Plaintiffs also rely on *Sherbert v. Verner,* 374 U.S. 398, 409-10 (1963), for the proposition that it was actionable retaliation when the government denied unemployment benefits to the plaintiff based on her speech. But these cases *prove* Ms. Crenson's point; namely, that the plaintiff must be denied a valuable, tangible benefit to which they were entitled, not merely one they desired or expected.

In *Suarez* the Court gave several examples of such cognizable "rights," including: a government job, the right not to be subjected to adverse employment actions such as transfers and demotions; the right not to have a government contract terminated, and as Plaintiffs observed, the right to unemployment benefits. *Id.*, 202 F.3d at 686-87. In other words, a plaintiff must show that they have suffered the loss of a "right" – and usually an economic right. The recent Fourth Circuit decision in *Tobey v. Jones*, 706 F.3d 379 (4th Cir. 2013) also bolsters this point for there the plaintiff was arrested, interrogated, and criminally charged – harms that are certainly tangible. *Id.* at 383-84.

In stark contrast to such tangible rights, in the instant case Plaintiffs describe the "right" they lost as follows: "What Plaintiffs lost was the benefit and privilege of rescuing cats/kittens that are held by Baltimore County for public adoption (and what they permanently lost was a *sense* that they could do so without further retaliation by Defendant Crenson." (ECF 19 at p. 24) (emphasis added). This is not a sufficient property or liberty interest under the law. Further, it was not something Plaintiffs even lost because, as noted above, Arnot attests in her Affidavit that they *did* continue to rescue animals from BCAS. So the property right they claim to have lost in this case is, apparently, the peace of mind of having the "sense" of doing so without fear of further retaliation.

Defendant Crenson respectfully submits that this is not a constitutionally protected "right," and therefore the alleged denial of the "right" is not actionable. *DiMeglio, Suarez, ACLU, supra.*[1]

**C.     Ms. Crenson is entitled to qualified immunity.**

Even if the Court concludes that Ms. Crenson violated the First Amendment by removing Fancy Cats from the approved list the Court should still grant her qualified immunity because her actions did not violate clearly established law.

As explained in Crenson's initial summary judgment memorandum, "[i]n deciding whether a right is clearly established the court must ask 'whether it would be clear to a reasonable officer [or in this case government official] that [her] conduct was unlawful in the situation he confronted.' *Saucier v. Katz,* 533 U.S.

---

[1] Plaintiffs repeatedly refer to a Facebook post by Don Mohler, a spokesman for the County Executive, and attach this post as Exhibit 5-A to their Opposition. Plaintiffs claim that Mohler's "request for assistance" from the rescue community in asking them to refrain from photography at the BCAS is an "*unconstitutional rule*" (ECF 19 at p. 25-26. And that "[d]iscovery is requested from Don Mohler, to demonstrate that Defendant [Crenson] was merely carrying out the practices and customs of Baltimore County to retaliate against government criticism . . .". *Id.* These sort of generalized attacks on persons and events are wholly unrelated, irrelevant, and inadmissible in the case against Ms. Crenson – the sole defendant in this case, who is sued only in her personal capacity. Further, they betray Plaintiffs' counsel's true intent in this case, namely, to use burdensome and overbroad discovery as part of a fishing expedition to further the attack agenda of the "REFORM" group. *See,* Proposed Discovery Chart at ECF 19, at pps. 39-40. This case is about an e-mail exchange on June 2, 2013 between Plaintiff Arnot and Ms. Crenson, and whether Crenson's "delisting" of Plaintiff was actionable First Amendment retaliation. This Court should not allow Plaintiffs' counsel to use it as a toehold for a general inquisition into every tangential issue related to the BCAS.

194, 202 (2001). And in conducting this analysis this court must use "the appropriate level of specificity" as to whether the law was clearly established given the facts in this particular case. *Wilson v. Layne,* 526 U.S. 603, 615 (1999). (ECF 14, pps. 20-21) Crenson then framed the question in this case with the appropriate level of specificity; namely, "whether, under the specific circumstances of this case, it was clearly established that removing Fancy Cats from the rescue list would constitute unlawful retaliation for that protected speech." *Id.* at p. 21.

Plaintiffs, of course, do not want the Court to use this proper focus, and protest, "[t]hat is **not** the correct standard, and Defendant Crenson is trying to seek qualified immunity by analyzing the issue far too narrowly. Defendant Crenson can 'still be on notice that [her] conduct violates established law even in novel factual circumstances.'" *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). (ECF 19, at p. 33) (emphasis in original). Plaintiffs also cite *Tobey, supra,* 706 F.3d at 391 n. 6 for the unremarkable proposition that "First Amendment rights are 'not an abstract principle but an irrefutable precept." (ECF 19, at p. 33)

But again Plaintiffs miss the point. In *Tobey*, the plaintiff was subjected to a clear and unequivocal deprivation of liberty in the form of arrest, interrogation and criminal prosecution. The Fourth Circuit explained why qualified immunity was not available to the defendants in those circumstances:

> While reasonableness in and of itself may be an ineffective guide as to whether a right is "clearly

> established," in this case there are clear constitutional parameters. It may be unclear as to what reasonableness entails in the abstract, but at a minimum, given well-established precedent, we know that it is *unreasonable* to effect an arrest without probable cause for displaying a silent, nondisruptive message of protest – which is what allegedly occurred here.

*Id.* 706 F.3d at 392 (emphasis in original).

By contrast, in the case at bar, Plaintiffs were not subjected to a clearly unconstitutional deprivation of rights, they were simply removed from a list of approved cat rescue groups after Plaintiff Arnot voiced her displeasure with her interaction with BCAS, and demanded "assurances" that changes would be made. Ms. Crenson submits that a reasonable animal control supervisor (who, unlike a police officer, does not receive formal and continuing education on constitutional principles) could believe in good faith that this action did not violate the First Amendment.

As explained above, while the broad parameters of the First Amendment's protection of speech are clear, whether the Constitution protects the right to rescue cats is far less clear. In restricting this right Ms Crenson made, at worst, a "bad guess in a gray area." *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992). She should, therefore, not be subjected to protracted litigation and the specter of personal liability as a result.

In a well-reasoned dissent from the *Tobey v. Jones* majority, Judge Wilkinson lamented that "[o]ne would think the Supreme Court's admonitions on the need for some modicum of specificity in notice to defendants might actually mean something. *See, e.g., Ashcroft v. al-Kidd,* 131 S.Ct. 2074, 2083-84 (2011)." *Tobey,* 706 F.3d at 395. He further explained that:

> By affording officials the latitude to make reasonable judgments, qualified immunity helps to avert two evils. Subjecting officials to damages actions when the governing law is unclear would incur "substantial social costs," as "fear of person monetary liability and harassing litigation will unduly inhibit officials in the discharge of their duties." *Anderson*, 483 U.S. at 638, 107 S.Ct. 3034. But qualified immunity is not premised on a utilitarian calculus alone; it also seeks to prevent "the injustice … of subjecting to liability an officer who is required, by the legal obligations of his position, to exercise discretion." *Scheuer*, 416 U.S. at 240, 94 S.Ct. 1683.

*Id.*

As noted above, the plaintiff in *Tobey* was arrested, interrogated and criminally charged. The right to be free from an unwarranted arrest is a right that is much more clearly established than the "right" to remain on a cat rescue group list. And so Judge Wilkinson's reasoning bears even more weight in the instant case. As does his further exhortation that:

> The rules of pleading assume particular importance in the context of a damages action against a public official, especially one alleging that the official acted with an impermissible motive. As the Supreme Court explained even before *Iqbal*, "[b]ecause an official's state of mind is easy to allege and hard to disprove," a court

13

confronting such an allegation "must exercise its discretion in a way that protects the substance of the qualified immunity defense … so that officials are not subjected to unnecessary and burdensome discovery or trial proceedings." *Crawford-El v. Britton*, 523 U.S. 574, 584-85, 597-98, 118 S.Ct. 1584, 140 L.Ed.2d 759 (1998) (internal quotation marks omitted). This Court has similarly observed that "the protection afforded officials by an objective test [for qualified immunity] would be illusory if the simple allegation of discriminatory animus sufficed to set it aside." *Gooden v. Howard Cnty., Md.*, 954 F.2d 960, 969 (4th Cir. 1992) (en banc). The doctrine of qualified immunity and the rules of pleading are therefore mutually reinforcing: the former ensures that officials cannot be subjected to damages suits for making close judgment calls where the governing law was unclear, while the latter ensure that this defense cannot be defeated by a bare allegation of impermissible motive.

*Id.* at 402.

These established qualified immunity concepts instruct this Court that Ms. Crenson is entitled to the defense in the instant case.[2]

**D.    The facts of this case cannot support an award of punitive damages.**

Ms. Crenson will not rehash her arguments concerning Plaintiffs' claims for punitive damages against her, except to reiterate that under both federal and Maryland law such damages are an "extraordinary remedy" that are designed to punish "truly egregious" conduct which is motivated by "evil and rancorous motives." *See,* ECF 14, pps. 22-23.

---

[2] Should the Court grant summary judgment on the basis of qualified immunity the Court should decline to exercise supplemental jurisdiction over Plaintiffs' state law claims and allow the Maryland courts to address these claims.

Yet Plaintiffs steadfastly maintain that the facts of this case would support such an award based on Crenson's alleged desire to hit Plaintiff Arnot "right where it hurt," in removing her from the list. And further, that "Defendant's malice is clear through her use of a clearly pretextual reason, and her obvious failure to substantively respond to Plaintiff's helpful suggestions." (ECF 19, at p. 37-38, *quoting* paragraph 26 of the Amended Complaint). They further aver that a jury could reasonably find that Crenson acted with an evil and rancorous motive because "[r]ather than resolve shelter issues, Defendant Crenson decided to spend her time 'digging deeper' into the background of the Plaintiffs . . .". *Id.*, at p. 38.

This statement by Ms. Crenson in an e-mail to a co-worker (Markley) is repeatedly referenced by Plaintiffs and described as "an absolutely frightening exchange between two very high ranking Baltimore County officials." (ECF 19, at pps. 10, 19, 30, 38).  They reason that Ms. Crenson told Markley that she would "dig deeper because she believes that FCRT is a cat hoarder." And that "Markley and Crenson go on and on about how they would like to perform warrantless searches of the homes of rescue fosters . . . Markley's plan was to contractually require Baltimore County agents to enter the homes of rescue fosters . . .". (ECF 19, at p. 30).  It is odd that avowed animal rights activists would have a problem with government officials looking into the possibility that a cat hoarder may be posing as a legitimate rescue group. Further, health and safety  inspections are

routinely conducted by both private and governmental agencies as a condition of rescuing or adopting pets. These inspections are done by consent and do not offend the Fourth Amendment any more than health inspections at restaurants. And again, why would animal advocates be against such inspections?

In the final analysis, the hyperbole and bombast that pervade Plaintiffs' papers, and their repeated references to red herrings - such as this alleged Fourth Amendment issue, and Mr. Mohler's "ban" on photography - only point up the fact that Plaintiffs' actual claims against Ms. Crenson are without merit.

## **CONCLUSION**

For all the foregoing reasons, and those set forth in Defendant Crenson's initial memorandum she respectfully asks this Court to enter judgment in her favor on all claims.

Respectfully submitted,

_____/s/_____
PAUL M. MAYHEW.
Assistant County Attorney
Old Courthouse, Room 219
400 Washington Avenue
Towson, Maryland 21204
(410) 887-4420
pmayhew@baltimorecountymd.gov
Counsel for Defendant Crenson

**Electronically Filed:  August 29, 2014**